# In the United States Court of Federal Claims

Nos. 20-575C and 20-609C (Consolidated)
(Filed Under Seal:  October 28, 2020)
(Reissued for Publication:  January 21, 2021)[*]

*****************************************

| | |
|---|---|
| SYSTEM STUDIES & SIMULATION, INC. and L3 DOSS AVIATION, INC., | * * * |
| Plaintiffs, | * * |
| v. | * * |
| THE UNITED STATES, | * * |
| Defendant, | * * |
| and | * * |
| CAE USA INC., | * * |
| Defendant-Intervenor. | * |

*****************************************

Postaward Bid Protest; Cross-Motions for Judgment on the Administrative Record; Evaluation of Proposals; Assignment of Strengths and Weaknesses; Best Value Tradeoff

Walter B. English, Huntsville, AL, and Kevin P. Mullen, Washington, DC, for plaintiffs.

Evan Wisser, United States Department of Justice, Washington, DC, for defendant.

Alexander B. Ginsberg, McLean, VA, for defendant-intervenor.

## OPINION AND ORDER

**SWEENEY**, Senior Judge

In this postaward bid protest, the second for this solicitation, plaintiffs System Studies & Simulation, Inc. ("S3") and L3 Doss Aviation, Inc. ("L3 Doss") contend that the United States Department of the Army, Mission and Installation Contracting Command ("MICC" or "the Agency") improperly awarded a contract for advanced helicopter flight training support at Fort Rucker to defendant-intervenor CAE USA Inc. ("CAE").  Before the court are cross-motions for judgment on the administrative record filed by S3, L3 Doss, CAE, and defendant.  For the reasons set forth below, the court grants defendant's and CAE's cross-motions for judgment on

---

[*]  This reissued Opinion and Order incorporates the agreed-to redactions proposed by the parties on January 19, 2021.  The redactions are indicated with bracketed ellipses ("[. . .]").

the administrative record and denies plaintiffs' requests for injunctive relief.

## I. BACKGROUND

### A. History of the Requirement

S3 and L3 Doss are both former incumbent contractors for this advanced helicopter flight training requirement.  Administrative R. ("AR") 125.  Under a single award, indefinite delivery/indefinite quantity contract administered by the United States Army National Guard Bureau, S3 provided these services from September 14, 2009, through May 23, 2010; it then continued its performance under a noncompetitive one-year task order until May 22, 2011.  Id. at 154-55.  MICC – Fort Rucker subsequently competed the requirement, using a best value tradeoff source selection method, and awarded a task order to S3 for a performance period of May 23, 2011, to May 22, 2013, which was extended to November 22, 2013.  Id. at 155.  The next contract, W911S0-14-D-0002, was awarded on a lowest price technically acceptable basis.  Id. at 123, 155.  The Agency awarded the contract to the company now known as L3 Doss on September 12, 2014, with an ordering period to end on September 15, 2018.[1]  Id. at 155.

In July 2017, in anticipation of the contract's expiration, the Agency issued a Sources Sought Notice.  Id. at 17-20.  Eleven offerors, including S3, L3 Doss, and CAE, responded.  Id. at 21-120.  Ultimately, the Agency resolved to solicit offers on a full and open basis.  Id. at 127-28.  Reasoning that shorter contract terms had made it difficult in the past to "recruit[] and retain[] contractors with the required unique experience and qualifications," the Agency opted to award the work for a seven-year term.  Id. at 147.

### B. The Solicitation

The Agency issued solicitation W9124G-18-R-0009 on June 25, 2018, to acquire advanced helicopter flight training support for the U.S. Army Aviation Center of Excellence ("USAACE") at Fort Rucker, Alabama.  Id. at 244, 256.  The Performance Work Statement ("PWS") outlined the following minimum daily training requirements by airframe:

- UH-60A/L Instructor Pilots ("IPs") – training capacity for 16 flight students
- UH 60A/L Maintenance Examiners – training capacity for 12 flight students
- AH-64D IPs – training capacity for 64 flight students
- CH-47F IPs – training capacity for 16 flight students
- CH-47F Flight Engineer ("FE") Non-Rated Crew Members ("NRCMs") –

---

[1]  The contract was awarded to Doss Aviation, Inc.  AR 1561.  That company was subsequently acquired by L3 Technologies, Inc., of which L3 Doss is a wholly owned subsidiary.  Id.

support capability for 5 aircraft

Id. at 532.  The Agency would award a single firm-fixed-price contract for a thirty-day phase-in period, an eleven-month base period, and six one-year option periods.  Id. at 144.

Section M of the solicitation described how the Agency planned to evaluate the proposals.  Id. at 588-95.  With respect to the substance of the evaluations, the Agency stated that it intended to award the contract to the offeror "whose proposal represents the best value after evaluation in accordance with the factors in the solicitation by utilizing the trade-off process." Id. at 588.  The solicitation outlined five such factors:  (1) technical capability, (2) staffing and management approach, (3) past performance, (4) small business participation, and (5) price.  Id. The relative importance of the factors was described as follows:

> Factor 1 (Technical Capability) and Factor 2 (Staffing and Management
> Approach) are of equal importance and are more importan[t] tha[n] all other non-
> price factors.  Factor 3 (Past Performance) is more important than Factor 4 (Small
> Business Participation).  In accordance with [Federal Acquisition Regulation
> ("FAR")] 15.304(e)(2), all non-price factors combined are significantly more
> important than Factor 5 (Price).

Id.  The Agency also advised:

> Although price is the least important evaluation factor, it has the potential
> to become more significant during the evaluation process.  The degree of
> importance of price will increase with the degree of equality of the proposals in
> relation to the other factors on which selection is to be based.  The importance of
> price will also increase when a proposal's price is so significantly high as to
> diminish the value to the Government that might be gained under the other
> aspects of the offer.  If, at any stage of the evaluation, all offerors are determined
> to have submitted equal, or virtually equal, non-price proposals, price could
> become the factor in determining which offerors shall receive the award.

Id. at 588-89.

For the technical capability factor, the Agency provided that it would evaluate "whether the Offeror's technical capability demonstrates the offeror's understanding of the requirements, capabilities, experiences, and abilities to execute the tasks described in the PWS."  Id. at 589. For the staffing factor, the Agency indicated that it would evaluate whether the offeror "demonstrates an understanding of the personnel requirements of the PWS as well as the ability to provide the personnel with the experience, qualifications, and clearances necessary to perform and manage all tasks described in the PWS by the contract start date," specifically including the following criteria:

- Whether the Offeror identified its subcontractors, teaming partners or joint

-3-

venture partners and described who will be used to perform this requirement by task and percentage of cost.

- Whether the proposed organizational chart displays positions, decision authority, and what parts of the organization are responsible for managing and accomplishing each task.

- Whether the Offeror's proposed hiring, training and retention plan provides an adequate number of properly qualified personnel, as specified in the PWS, necessary to perform and manage the contract's requirements.

- Whether the Offeror identified its proposed staffing (by number of personnel, labor category and company) and any plans to cross-utilize or rely on reach-back, part-time or temporary personnel during contract performance.

- Whether the Offeror identified the names of the Key Personnel who will perform under this contract, provided resumes that clearly demonstrate that they satisfy or possess all applicable certifications and other qualifications required for their designated positions and provided Letters of Commitment signed within 60 days of the due date for proposal submission.

- Whether the Offeror proposed [a] plan to execute the Employee Training Agreement Program as specified in PWS 1.6.17 and provided a copy of the agreement that the Offeror / Contractor intends to enter into with its affected employees.

Id. For both the technical capability factor and staffing factor, evaluators would designate strengths, weaknesses, significant weaknesses, deficiencies, and risks.[2] Id. at 590. Evaluators would then assign adjectival ratings based on a combined technical/risk ratings table:

---

[2] A "strength" is "an aspect of an offeror's proposal that has merit or exceeds specified performance or capability requirements in a way that will be advantageous to the Government during contract performance." AR 590. A "weakness" is "a flaw in the proposal that increases the risk of unsuccessful contract performance." Id. A "significant weakness" is "a flaw that appreciably increases the risk of unsuccessful contract performance." Id. A "deficiency" is "a material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level." Id. "Risk" is "the potential for unsuccessful contract performance," and "[t]he consideration of risk assesses the degree to which an offeror's proposed approach to achieving the technical factor or sub-factor may involve risk of disruption of schedule, degradation of performance, the need for increased Government oversight, and the likelihood of unsuccessful contract performance." Id.

| Technical Rating | Description |
|---|---|
| Outstanding | Proposal indicates an exceptional approach and understanding of the requirements and contains multiple strengths, and risk of unsuccessful performance is low. |
| Good | Proposal indicates a thorough approach and understanding of the requirements and contains at least one strength, and risk of unsuccessful performance is low to moderate. |
| Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements, and risk of unsuccessful performance is no worse than moderate. |
| Marginal | Proposal has not demonstrated an adequate approach and understanding of the requirements, and/or risk of unsuccessful performance is high. |
| Unacceptable | Proposal does not meet requirements of the solicitation, and thus, contains one or more deficiencies, and/or risk of unsuccessful performance is unacceptable.  Proposal is unawardable. |

Id. at 589-90.

For the past performance factor, the Agency would "assess the relative risks associated with an Offeror's likelihood of success in performing the solicitation's requirements as indicated by that Offeror's record of past performance."  Id. at 590.  Its risk assessment would encompass consideration of recent and relevant past performance.[3]  Id. at 591.  The Agency outlined adjectival ratings for the relevancy of the past performance:

| Rating | Description |
|---|---|
| Very Relevant | Present/past performance effort involved essentially the same scope and magnitude of effort this solicitation requires. |
| Relevant | Present/past performance effort involved similar scope and magnitude of effort this solicitation requires. |
| Somewhat Relevant | Present/past performance effort involved some of the scope and magnitude of effort this solicitation requires. |

---

[3]  The solicitation classified recent performance as ongoing contracts, or those contracts performed within three years of the solicitation's issuance.  AR 591.

| Not Relevant | Present/past performance effort involved little or none of the scope and magnitude of effort this solicitation requires. |
|---|---|

Id. at 592.  The Agency described the following adjectival ratings:

| Adjectival Rating | Description |
|---|---|
| Substantial Confidence | Based on the offeror's recent/relevant performance record, the Government has a high expectation that the offeror will successfully perform the required effort. |
| Satisfactory Confidence | Based on the offeror's recent/relevant performance record, the Government has a reasonable expectation that the offeror will successfully perform the required effort. |
| Neutral Confidence | No recent/relevant performance record is available or the offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned.  The offeror may not be evaluated favorably or unfavorably on the factor of past performance. |
| Limited Confidence | Based on the offeror's recent/relevant performance record, the Government has a low expectation that the offeror will successfully perform the required effort. |
| No Confidence | Based on the offeror's recent/relevant performance record, the Government has no expectation that the offeror will be able to successfully perform the required effort. |

Id. at 593.

For the small business participation factor, the Agency intended to evaluate the following areas:

| Adjectival Rating | Extent to which SB Firms are Specifically Identified | Extent of Commitment to Identified Firms | Complexity & Variety of Work SB Firms will Perform | Extent of Participation of SB Firms in Terms of the Value of the Total Acquisition | Extent of Utilization of SB firms on prior contracts |
|---|---|---|---|---|---|
| Outstanding | SB Firms are identified by name in each category proposed. | Written Agreements in place with all SB firms. | Wide variety of work to be provided by SB firms to include technically complex work. | SB firms will provide a significant amount of the value of the total acquisition. | Significant utilization of SB firms in prior contracts. |
| Good | SB Firms are identified by name in most categories proposed. | Written agreements in place with several SB firms. | Some variety of work to be performed by SB firms to include technically complex work. | SB firms will provide a substantial amount of the value of the total acquisition. | Substantial utilization of SB firms in prior contracts. |
| Acceptable | SB Firms are identified by name in some categories proposed. | Written agreements in place with some SB firms. | Some variety of work to be performed by SB firms (absent technically complex work). | SB firms will provide meaningful amount of the value of the total acquisition. | Meaningful utilization of SB firms in prior contracts. |
| Marginal | SB Firm identified by name in only one category proposed. | Written agreement in place [with] only one SB firm. | SB firms will only be utilized to provide supplies on the contract. | SB firms will provide a minimal amount of the value of the total acquisition. | Modest utilization of SB firms in prior contracts. |

| Unacceptable | No SB Firms Identified by Name. | No indication of any written agreement in place with any SB firm. | No identification of how SB firms will be utilized. | SB firms will provide an insignificant amount of the value of the total acquisition. | Insignificant utilization of SB firms in prior contracts with no valid rationale. |
|---|---|---|---|---|---|

Id. at 593-94.  The Agency also outlined the following adjectival ratings:

| Rating | Description |
|---|---|
| Outstanding | Proposal indicates an exceptional approach and understanding of the small business objectives. |
| Good | Proposal indicates a thorough approach and understanding of the small business objectives. |
| Acceptable | Proposal indicates an adequate approach and understanding of small business objectives. |
| Marginal | Proposal has not demonstrated an adequate approach and understanding of the small business objectives. |
| Unacceptable | Proposal does not meet small business objectives. |

Id. at 594.

## C.  Initial Evaluation of Proposals and Source Selection Decision

The initial proposal deadline was July 25, 2018, id. at 316, but was later extended to September 12, 2018, id. at 441.  Seven offerors submitted timely proposals:  L3 Doss; S3; [. . .]; [. . .]; CAE; [. . .]; and [. . .].  See generally id. at 843-3168 (proposals).  Based on assessments from the Agency's Source Selection Evaluation Board ("SSEB") (id. at 3575-90), Technical Evaluation Team (id. at 3274-460), Past Performance Evaluation Team ("PPET") (id. at 3499-548), and Contract Price Cost Analyst (id. at 3549-74), the Agency established a competitive range and initiated discussions with CAE, [. . .], S3, and L3 Doss.  Id. at 3616.  On August 7, 2019, the Agency sent Evaluation Notices and requests for final proposal revisions to these offerors, and each submitted a timely response.  Id. at 4378.

As part of the Technical Evaluation Team's final assessment, it evaluated the offerors' strengths for the first two factors.  Id. at 4259-86.  For the technical capability factor, S3 received two strengths for (1) its [. . .] and (2) its [. . .].  Id. at 4275.  L3 Doss received one strength for its [. . .].  Id. at 4268.  CAE received two strengths for (1) its [. . .] and (2) its [. . .].  Id. at 4260.  For the staffing factor, S3 received a strength for its [. . .] which included [. . .].  Id. at 4279.  L3 Doss received three strengths for the staffing factor:  (1) [. . .]; (2) [. . .]; and (3) [. . .].  Id. at 4272.  [. . .] received two strengths.  Id. at 4286.  CAE received six strengths related to the staffing factor:  (1) [. . .]; (2) [. . .]; (3) [. . .]; (4) [. . .]; (5) [. . .]; and (6) [. . .].  Id. at 4264-65.

For the past performance factor, each offeror submitted references for past or ongoing contracts. Id. at 3499-548. S3 offered six such references. Id. at 3529. The first reference, for helicopter training services, was classified as recent and very relevant, with a rating of substantial confidence. Id. The second reference, for helicopter training services, was classified as partially recent and very relevant, with a rating of satisfactory confidence. Id. The third reference, for helicopter training services, was classified as recent and relevant, with a rating of substantial confidence. Id. The fourth reference, for Blackhawk helicopter training, was classified as partially recent and relevant, with a rating of satisfactory confidence. Id. The fifth and sixth references, both for helicopter training, were classified as recent and relevant, with ratings of satisfactory confidence. Id.

L3 Doss submitted four past performance references. Id. at 3522. The first reference, for the prior contract, was classified as recent and very relevant, with a rating of satisfactory confidence. Id. The second reference, for fixed-wing aircraft training and other services, was classified as partially recent and relevant, with a rating of substantial confidence. Id. The third reference, for fixed-wing aircraft training and other services, was classified as recent and relevant, with a rating of satisfactory confidence.[4] Id. The fourth reference, for simulator training, was classified as partially recent and somewhat relevant, with a rating of satisfactory confidence. Id.

CAE submitted four past performance references. Id. at 3516. The first reference, for live flight and simulator-based training, was classified as recent and relevant, with a rating of substantial confidence. Id. The second reference, for unmanned aerial vehicle flight instruction, was classified as recent and relevant, with a rating of satisfactory confidence. Id. The third reference, for fixed-wing flight training, was classified as recent and somewhat relevant, with a rating of satisfactory confidence. Id. The fourth reference, for helicopter training, was classified as recent and somewhat relevant, with a rating of satisfactory confidence. Id.

[. . .] submitted one past performance reference, for a contract involving helicopter training. Id. at 3545. The reference was classified as recent and very relevant, with a rating of substantial confidence. Id.

Incorporating the evaluations of the SSEB, the Source Selection Authority ("SSA") assigned the offerors the following ratings in her Source Selection Decision ("SSD"):

---

[4] For this contract, L3 Doss's graduation rates fell below the 90% required by the PWS. AR 3526. To address this deficiency, L3 Doss provided the Agency with a "Get Well Plan" on October 6, 2017. Id. The plan sought "support [and/or] relief in several areas to help alleviate some of [L3 Doss's] late programmed student graduations . . . ." Id. The Agency accepted and implemented the plan. Id. The plan "was successful in conjunction with the significant concessions granted by the government, which also included significant reductions in student numbers during the last quarter of CY17." Id.

|  | L3 Doss | [. . .] | S3 | CAE |
|---|---|---|---|---|
| Factor 1 – Technical Capability | Good | Good | Outstanding | Outstanding |
| Factor 2 – Staffing and Management Approach | Good | Good | Good | Outstanding |
| Factor 3 – Past Performance | [. . .] Confidence | [. . .] Confidence | [. . .] Confidence | [. . .] Confidence |
| Factor 4 – Small Business Participation | Good | Good | Good | Good |

Id. at 4390.  The SSA also noted the final proposed and evaluated prices:

| Offeror | Total Proposed Price | Total Evaluated Price (inclusion of FAR 52.217-8) |
|---|---|---|
| L3 Doss | $[. . .] | $[. . .] |
| [. . .] | $[. . .] | $[. . .] |
| S3 | $[. . .] | $[. . .] |
| CAE | $[. . .] | $96,655,774.45 |

Id. at 4349.  The Agency found each of the proposed prices to be fair, reasonable, realistic, and balanced.  Id. at 4450.

### D.  The Prior Bid Protest

S3 filed its initial bid protest on October 1, 2019.[5]  See generally Sys. Studies & Simulation, Inc. v. United States, 146 Fed. Cl. 186 (2019).  The court concluded that S3 was not prejudiced by the Agency's staffing evaluation, and that the Agency's past performance evaluation was reasonable.  However, the court agreed with S3 that the Agency failed to engage in a proper tradeoff analysis and effectively converted the acquisition to a lowest price technically acceptable procurement—an error that prejudiced S3.  The court thus enjoined the Agency from proceeding with contract performance and ordered the Agency to "reevaluate the proposals in the competitive range and render a new Source Selection Decision, performing a new tradeoff analysis and assigning each factor the appropriate weight in accordance with this court's decision."  Id. at 204.

---

[5] L3 Doss intervened in this protest, as the awardee at the time, but it did not file briefs or participate in oral argument.

**E.  Reevaluation**

Pursuant to the court's decision, the SSEB reevaluated factors 1 and 2 for offerors in the competitive range.[6]  AR 4858.  For the technical capability factor, the strengths, weaknesses, and overall ratings assigned to S3, L3 Doss, and CAE remained unchanged.[7]  For the staffing factor, in contrast, some ratings shifted.  CAE received five strengths rather than six, id. at 4408-09, 4769-70, and S3's strengths increased from one to two, id. at 4406, 4798-99.[8]  The overall staffing factor rating for S3 and L3 Doss also increased from Good to Outstanding.  Id. at 4399, 4404, 4765, 4781, 4797.

As reflected in the new SSD, based on the SSEB's updated evaluation, the SSA performed a new best value tradeoff analysis.  For the technical capability factor, the SSA concluded that both S3 and CAE submitted "relatively equal technical proposals" and that both had received Outstanding ratings.  Id. at 4871.  She also observed that L3 Doss trailed behind these two offerors with a Good rating.  Id. at 4862-63.  Turning to the staffing factor, the SSA noted that CAE, S3, and L3 Doss had all received Outstanding Ratings.  Id. at 4863.  However, she also concluded that CAE's "numerous strengths" made it "clearly superior."  Id.  She observed that under this factor, CAE's proposal "well exceeded all other offerors' proposals, with several unique strengths which distinguish it."  Id. at 4865.  For the past performance factor, the SSA noted that S3's rating of substantial confidence exceeded CAE and L3 Doss's equal ratings of satisfactory confidence.  Id. at 4868-69.  And for the small business participation factor, she commented that CAE and L3 Doss had "distinguished themselves" with a higher small business commitment than S3.  Id. at 4869.  The SSA summarized the offerors' final ratings as follows:

|  | L3 Doss | [. . .] | S3 | CAE |
|---|---|---|---|---|
| Factor 1 – Technical Capability | Good | Good | Outstanding | Outstanding |
| Factor 2 – Staffing and Management Approach | Outstanding | Good | Outstanding | Outstanding |
| Factor 3 – Past Performance | Satisfactory Confidence | Substantial Confidence | Substantial Confidence | Satisfactory Confidence |

---

[6]  Because the court did not order reevaluation of factor 3 (past performance) and factor 4 (small business participation), the SSEB did not revisit them.  AR 4858.

[7]  While the number of strengths did not change, the SSEB awarded S3 and CAE strengths on [. . .] alone, rather than on both [. . .].  AR 4861-62.

[8]  CAE no longer received a strength for its [. . .].  AR 4409.  Additionally, the SSA clarified that CAE had proposed to hire [. . .], setting it apart from the other offerors.  Id. at 4865 ("All other offerors only proposed [. . .], and none of the other offerors proposed a [. . .].").  S3 gained a strength for its proposal to hire a [. . .].  Id. at 4799.

| Factor 4 – Small Business Participation | Good | Good | Good | Good |
| --- | --- | --- | --- | --- |

Id. at 4861.

The SSA next described how her independent assessment had led her to select CAE as the contract awardee. Going beyond the ratings assigned to each proposal, she documented the "unique strengths" that CAE's proposal offered under the staffing factor. Id. at 4871. Considering the relatively small differences between the offerors' past performance and small business participation ratings, the SSA concluded that CAE's advantages under the first two factors gave it the lead in terms of nonprice factors. Id. at 4872. The SSA also engaged in a careful evaluation of the offerors' prices. She compared CAE's total evaluated price to the prices of each other offeror, indicating precise percentages for the price differences. Id. at 4870. She explained:

> The Solicitation advised that "the importance of price will also increase when a proposal's price is so significantly high as to diminish the value to the Government that may be gained under the other aspects of the offer." CAE's proposed price is not "so significantly high as to diminish the value to the Government that may be gained under other aspects of the proposal." While CAE proposed the highest total evaluated price (TEP), CAE's TEP is below the [Independent Government Cost Estimate] and is only $[. . .] or [. . .]% higher than S3's TEP. This amounts to approximately $[. . .] more per month over the phase-in, base, 6 option years, and an optional 6-month extension (approximately 90 months), in comparison to S3's TEP monthly cost. For this relatively small difference in price, the Government will realize significant benefits including the three unique strengths discussed above and an additional proposed [. . .] [full-time equivalent employees ("FTEs")].

Id. at 4872. Ultimately, she concluded that "paying more for the values proposed in CAE's proposal is advantageous to the program in the long-run and is consistent with the solicitation." Id. at 4873. On May 5, 2020, the Agency awarded the contract to CAE. Id. at 5515.

### F. This Bid Protest

On May 8, 2020, S3 filed the instant bid protest, challenging the Agency's award to CAE. L3 Doss similarly protested the award on May 15, 2020, and the court consolidated the protests. The court also granted CAE's motion to intervene in the protest to defend its receipt of the contract.

On June 3, 2020, at defendant's request, the court remanded the matter to the Agency. The court instructed the Agency to evaluate allegations by L3 Doss that the Agency had not properly considered the impact of two CAE flight accidents on CAE's past performance rating.

-12-

The Agency submitted its Decision on Remand on June 15, 2020, in which it maintained that CAE's satisfactory past performance made it a responsible offeror. Id. at 5566-69. Regarding an October 18, 2017 incident, the responsible Contracting Officer's Representative ("COR") considered the incident when he evaluated CAE's performance. Id. at 5567. Although he considered the contractor to be at fault, he noted that "it was a one-time incident, . . . there were no injuries, and . . . the pilot was able to complete training on time." Id. at 5567-68. Regarding a March 8, 2017 incident, the COR indicated that he "did not consider the contractor to be at fault for the . . . incident because it was his understanding that the incident was the result of equipment failure, not pilot error." Id. at 5568. Similarly, the Agency noted that a National Transportation Safety Board ("NTSB") Aviation Accident Preliminary Report had not determined that "CAE's instructor or pilot were at fault during the maneuvering of the aircraft or that the loss of engine power was to due anything either party did during the training." Id.

The parties' motions have been fully briefed; because none of the parties requested oral argument and the court deemed oral argument unnecessary, this matter is now ripe for adjudication.

## II. DISCUSSION

In ruling on motions for judgment on the administrative record pursuant to Rule 52.1(c) of the Rules of the United States Court of Federal Claims, "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005)). Because the court makes "factual findings . . . from the record evidence," judgment on the administrative record "is properly understood as intending to provide for an expedited trial on the record." Bannum, 404 F.3d at 1356.

### A. Legal Standards

The court reviews challenged agency actions pursuant to the standards set forth in 5 U.S.C. § 706. 28 U.S.C. § 1491(b)(4). Specifically, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): A reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004). Under this standard, the court

> may set aside a procurement action if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." A court reviews a challenge brought on the first ground "to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations."

-13-

Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citations omitted) (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332-33 (2001)); accord Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) ("The arbitrary and capricious standard . . . requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors.").

Procurement officials "are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1332-33 (quoting Latecoere Int'l, Inc. v. U.S. Dep't of the Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)). Thus, the court's review of a procuring agency's decision is "highly deferential." Advanced Data Concepts, Inc., 216 F.3d at 1058. Furthermore, a "protestor's burden of proving that the award was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law is greater [in negotiated procurements] than in other types of bid protests." Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004). And, when a contract is to be awarded on a "best value" basis, procurement officials have "even greater discretion than if the contract were to have been awarded on the basis of cost alone." Id. (citing E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government.")). Consistent with the deference accorded to procuring agencies conducting negotiated procurements, when a protestor challenges a procuring agency's evaluation of a technical proposal, the court's "review . . . should be limited to determining whether the evaluation was reasonable, [was] consistent with the stated evaluation criteria and complied with relevant statutory and regulatory requirements." Banknote Corp. of Am. v. United States, 56 Fed. Cl. 377, 381 (2003), aff'd, 365 F.3d 1345; accord E.W. Bliss Co., 77 F.3d at 449 ("[T]echnical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess.").

"[O]verturning awards on de minimis errors wastes resources and time, and is needlessly disruptive of procurement activities and governmental programs and operations." Grumman Data Sys. Corp. v. Widnall, 15 F.3d 1044, 1048 (Fed. Cir. 1994) (quoting Andersen Consulting Co. v. United States, 959 F.2d 929, 932 (Fed. Cir. 1992)). Thus, in addition to showing "a significant error in the procurement process," a protestor must show "that the error prejudiced it." Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996); see also Bannum, Inc., 404 F.3d at 1351 (holding that if the procuring agency's decision lacked a rational basis or was made in violation of the applicable statutes, regulations, or procedures, the court must then "determine, as a factual matter, if the bid protester was prejudiced by that conduct"). "To establish prejudice . . . , a protester must show that there was a 'substantial chance' it would have received the contract award absent the alleged error." Banknote Corp. of Am., 365 F.3d at 1351 (quoting Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1086 (Fed. Cir. 2001)); see also Data Gen. Corp., 78 F.3d at 1562 ("[T]o establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract.").

## B. Technical Capability Factor

### 1. The Agency Did Not Err by Declining to Award L3 Doss a Strength for Its Incumbency

L3 Doss first contends that in addition to the strength it received under the technical capability factor for its [. . .], it also deserved an independent strength for its incumbency. The language used to describe the strength, L3 Doss emphasizes, clearly focuses on L3 Doss's incumbency and contrasts sharply with the language used to describe CAE's strength, which focused on its "[. . .]." L3 Doss Mot. 10 (citing AR 5077). L3 Doss asserts that because "the benefits of incumbency and [. . .] are not one and the same[,] [a]n offeror that can provide both necessarily offers greater value to the Army than an offeror that can provide only one." Id. at 11.

Defendant counters that "[t]he solicitation did not specify any need or benefit to the Government deriving from incumbency" and maintains that the Agency properly assigned L3 Doss, S3, and CAE strengths for their similar experiences. Def. Mot. 22. The court agrees. The Agency applied this strength with consistency, giving credit to each offeror for the same type of activities. For L3 Doss, the Agency emphasized its [. . .] as the follow-on requirement and that L3 Doss could provide "[. . .]." AR 5085. For S3, the Agency observed that it had [. . .] and that this [. . .]. Id. at 5092-93. For CAE, the Agency noted that it [. . .]. Id. at 5077. The court finds no inequality in the Agency's consideration of each offeror's overall experience and specific familiarity with the Agency's needs under this solicitation.

The Agency could hardly have assigned an "[. . .]" strength to L3 Doss without referencing its incumbency, and the fact that it did so here does not improperly diminish the value of that incumbency. The court may not award "extra credit" for incumbency where, as here, the solicitation does not require it and the SSA herself has declined to do so. Accord PGBA, LLC v. United States, 60 Fed. Cl. 196, 209 (2004); see also United Concordia Cos. v. United States, 99 Fed. Cl. 34, 45 (2011) ("We will not upset the agency's rating simply because plaintiff was the incumbent and believes its experience to be superior.").

### 2. The Agency Did Not Err by Declining to Award L3 Doss a Strength for its [. . .]

L3 Doss also takes issue with the Agency's treatment of its [. . .]. Because L3 Doss expected to secure this [. . .] "well before contract performance was to commence," L3 Doss Mot. 12, it argues that the SSA's conclusion that it had not proposed an [. . .] was erroneous, id. at 13 (citing AR 4868). L3 Doss also observes that while the Agency initially assigned strengths to CAE and S3 based on this [. . .], the SSA in the final SSD revised this rationale to focus instead on [. . .]. Id. at 14 (citing AR 5077, 5092). Thus, L3 Doss alleges that "rather than acknowledging L3 Doss's [. . .] and assigning a strength, the Army simply manufactured a new basis for the strength assigned to CAE and S3." Id. Defendant responds that (1) L3 Doss failed to inform the Agency that it had in fact obtained the [. . .], Def. Mot. 22-23, and (2) the Agency had a rational basis for turning to the [. . .], id. at 23-24.

Whether the Agency improperly disregarded L3 Doss's [. . .] is immaterial, because the court finds no error in the Agency's focus on [. . .]. "[A]n agency has the right to change its

mind in the course of an evaluation if it has good reason," <u>VanGuard Recovery Assistance v.</u> <u>United States</u>, 101 Fed. Cl. 765, 786 (2011), and such is the case here. The strength awarded to CAE noted a rational distinction between the two [. . .]: "[. . .] takes the [. . .] and supplements them with additional [. . .], which are established by the [. . .]." AR 5077. Weighing the relative benefits of [. . .] and [. . .] is precisely the kind of technical evaluation that "requires the special expertise of procurement officials," and thus deserves "the greatest deference possible." <u>Sys.</u> <u>Application & Techs., Inc. v. United States</u>, 100 Fed. Cl. 687, 718 (2011) (quoting <u>Fort Carson</u> <u>Support Servs. v. United States</u>, 71 Fed. Cl. 571, 586 (2006)). Thus, the court finds no error in the distinctions drawn by the Agency between the [. . .] and [. . .], or its consequent decision to award strengths only to CAE and S3.

### 3.  The Agency Did Not Err by Declining to Award L3 Doss Other Technical Strengths

L3 Doss next asserts that four other aspects of its proposal merited strengths, which the Agency failed to award. Proper recognition of these strengths, L3 Doss alleges, would have entitled it to an Outstanding rating under the technical capability factor. L3 Doss Mot. 17-20. Here, as above, the court refuses to substitute its own judgment for the Agency's special expertise.

First, L3 Doss notes that it proposed "[. . .]" with "[. . .]." <u>Id.</u> at 16 (citing AR 1576). The court concurs with defendant that this [. . .] is not "an aspect of an offeror's proposal that has merit or exceeds specified performance or capability requirements" but is instead a basic requirement of the solicitation. Def. Mot. 22 (quoting AR 590). This fact is evidenced, in part, by the solicitation's specific provision for [. . .]. AR 527-28, 553-54. Although L3 Doss asserts that its position as the incumbent uniquely [. . .], L3 Doss Resp. 16, the court reiterates that nothing requires the Agency to award L3 Doss a strength simply for its incumbency.

Second, L3 Doss emphasizes that it offered "[. . .]," as demonstrated by its low NTSB General Aviation training accident rate. L3 Doss Mot. 16 (citing AR 1576). It posits, in part, that because the solicitation explicitly provides for decertification of contractor personnel in the event of a "[f]ailure to protect or properly care for Government property or equipment" or "[a]cts that endanger the health or safety of Government or contractor personnel," safety history was a relevant criterion when evaluating strengths. L3 Doss Resp. 12 (quoting AR 525). These provisions, however, do not constitute stated evaluation criteria. The Agency's decision not to award any offeror a strength based on safety record was thus proper.[9] <u>See</u> <u>NEQ, LLC v. United</u> <u>States</u>, 88 Fed. Cl. 38, 48 (2009) ("It . . . is beyond peradventure that the government may not rely upon undisclosed evaluation criteria when evaluating proposals."); <u>Forestry Surveys & Data</u> <u>v. United States</u>, 44 Fed. Cl. 493, 499 (1999) (noting that "agency evaluation personnel are given great discretion in determining the scope of an evaluation factor").

---

[9]  Significantly, the NTSB General Aviation training accident rate cited by L3 Doss focused on civil aviation rather than military aviation training. AR 1576. Even if the Agency had decided to award strengths based on safety record, it would not necessarily have considered this statistic relevant.

Third, L3 Doss notes that it "committed to continuing to support [. . .] flying requests." L3 Doss Mot. 16-17 (citing AR 1592).  Contrary to L3 Doss's assertions, however, the solicitation itself required [. . .].  AR 531-32.  The Agency rationally concluded that "meeting solicitation requirements should not be considered a strength."  Quest Diagnostics, Inc. v. United States, 110 Fed. Cl. 716, 726 (2013).

Fourth, L3 Doss indicates that it offered "[. . .]," thereby ensuring "[. . .]."  L3 Doss Mot. 17 (citing AR 1598).  It also emphasizes that because it already conducted this process as the incumbent, its proposal allowed it to "eliminate the potential for performance disruption and streamline transition activities."  L3 Doss Resp. 12.  But once again, L3 Doss promises to do little more than comply with the terms of the solicitation.  L3 Doss's description of its procedure for [. . .] is, essentially, a slightly more detailed description of the procedure outlined in the PWS.  Compare AR 527 (PWS 1.6.19), with id. at 1598 (L3 Doss's description of its implementation of PWS 1.6.19).  And to the extent L3 Doss argues that its incumbency would allow it to carry out this task more efficiently, the same could be said of almost any task described in the PWS.  Other than the alleged benefits inherent to its incumbency, L3 fails to explain why the Agency's decision not to award it a strength on this point was improper.

## C.  Staffing Factor

### 1.  The Agency Did Not Err by Awarding Both CAE and L3 Doss Strengths for [. . .]

The parties' dispute regarding the significance of [. . .] L3 Doss received from [. . .] evolved over the course of briefing.  L3 Doss initially asserted that because it had secured [. . .], the Agency should not have assigned CAE a strength for the mere intention to [. . .].  L3 Doss Mot. 20-21.  However, CAE later demonstrated not only that CAE had in fact obtained [. . .],[10] CAE Mot. 16-18, but that the [. . .] secured by L3 Doss did not appear on their face to be [. . .], id. at 20-21.  L3 Doss ultimately withdrew its argument, L3 Doss Resp. 13 n.4, but S3 continues to maintain that the Agency erred on this point.  Specifically, S3 asserts that because the Agency knew that L3 Doss had claimed [. . .], the Agency had a duty to investigate the situation further before assigning CAE a strength for [. . .].  S3 Resp. 9-11.

S3's argument is grounded in mere speculation.  As defendant emphasizes, Def. Reply 6, the record does not support the existence of a [. . .] that might stop CAE from following through on its [. . .].  And indeed, L3 Doss's withdrawal of its argument seems to resolve the question in favor of CAE and the Agency.  See L3 Doss Resp. 13 n.4 (indicating that the [. . .] was only oral); AR 1626, 1632 (L3 Doss [. . .], stating that "[e]ither party may terminate this [. . .] at any time for any reason").  The SSA, of course, did misstate the record when she initially indicated that [. . .], but no prejudice resulted.  Both CAE and L3 Doss ultimately received strengths for [. . .], and the record does not suggest that the SSA somehow valued one of these strengths more

---

[10]  This misunderstanding apparently stems from an erroneous statement in the April 20, 2020 SSD:  "Unlike L3, CAE does not provide [. . .]."  AR 4864.  The SSA later corrected the error.  Id. at 5621-22.

than the other.  See id. at 5622 ("The two wording errors in my [Source Selection Decision Document], which mistakenly indicated that CAE did not submit the [. . .], were not relevant to my analysis or award decision on April 23, 2020, because at the time I had understood that CAE did, in fact, submit the [. . .].").  Any initial confusion regarding the status of these offerors' [. . .] fits squarely within the realm of "de minimis error[ that] wastes resources and time."  Grumman Data Sys. Corp., 15 F.3d at 1048.

## 2.  The Agency Erred by Awarding CAE a Strength for its [. . .] Approach

The strength awarded to CAE's proposed [. . .] approach has also raised S3's ire.  In its proposal, CAE stated that if it was [. . .].  AR 1345.  S3 contends that because the solicitation already required offerors to [. . .], CAE's proposal merely followed the solicitation's requirements or, alternatively, departed improperly from the firm-fixed-price nature of the solicitation's contract line item numbers ("CLINs").  S3 Mot. 22-23.  S3 thus maintains that by concluding that CAE's billing approach would result in "significant cost savings," the Agency acted irrationally.  Id. at 24.  Meanwhile, L3 Doss asserts that because, "like CAE, L3 Doss proposed to [. . .]," L3 Doss also deserved a strength.  L3 Doss Mot. 21.

Defendant offers several defenses.  First, defendant asserts that the solicitation's reference to "[. . .]" reimbursement for [. . .] referred to the number and type of instructors required rather than the [. . .].  Def. Mot. 16.  Second, defendant casts CAE's proposal not as an improper deviation from a firm-fixed-price payment structure, but as "an offer to modify the default risk allocation under the terms of the solicitation."  Id. at 17.  Because CAE intended to [. . .], defendant asserts, the risk of loss would be shared by both CAE and the Agency.  Id. Third, defendant maintains that the SSA justified CAE's price premium based on its "increased offer of services," not just the potential savings from its [. . .] practices.  Id. at 32.  As for L3 Doss's contention, defendant maintains that the language in L3 Doss's proposal gave the Agency "no reason to believe that L3 was offering a new [. . .] billing system for [. . .]."  Id. at 18.

As an initial matter, the court considers whether the Agency impermissibly deviated from the firm-fixed-price payment structure.  A firm-fixed-price contract "is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract."  FAR 16.202-1.  As a result, "[t]he essence of a firm fixed-price contract is that the contractor, not the government, assumes the risk of unexpected costs."  Lakeshore Eng'g Servs., Inc. v. United States, 748 F.3d 1341, 1347 (Fed. Cir. 2014).  A firm-fixed-price contract allows "the government [and contractor to be] aware of the total contract price at the time of acceptance." First Enter. v. United States, 61 Fed. Cl. 109, 124 n.23 (2004).  The stated price of such a contract may be "subject to adjustment only by operation of contract clauses providing for equitable adjustment or other revision of the contract price under stated circumstances."  FAR 16.201(a).  This solicitation involves just such a "stated circumstance."

When the Agency outlined its approach to [. . .] in the solicitation, it fundamentally disrupted the normal operation of a firm-fixed price contract.  In sharp contrast to the certainty that characterizes most firm-fixed-price contracts, the solicitation's approach was, as CAE put it, "inherently indefinite."  CAE Mot. 25.  Similarly, by allowing contractors to bill "up to the level

of support approved by the Contracting Officer," AR 532, the solicitation's approach shifted the risk from the contractor to the government. CAE's [. . .] proposal [. . .], where a firm-fixed-price contract normally would have allocated it. Because the Agency had already departed from the firm-fixed-price structure in this very limited instance, the court determines that it was not prohibited from considering the value of CAE's unique pricing proposal.

An equally critical question remains: whether the Agency acted rationally when it concluded that CAE's billing approach constituted a strength. In an e-mail message to the SSA, the COR offered the following explanation of the Agency's [. . .] requirements:

> [. . .] are not in the Program of Instruction (POI) at [USAACE]. [. . .] are considered to be [. . .]. This means that the contractor would primarily provide instructors [. . .]. [. . .] provides a [. . .] capability. Some months have passed with no [. . .] flying and some months have gone with every [. . .] flying [. . .] days. It is difficult to provide a set, or even an average, number of [. . .] days per year. Regardless, the offer of [. . .] is a financial benefit to the government.

Id. at 4834. This exchange is typical of the Agency's discussion of CAE's [. . .] proposal—that is, no Agency official was willing to hazard a guess as to the amount of money the Agency might expect to save. In its review of the SSD and the evaluations that contributed to it, the court can be certain only of the following. First, [. . .] would only occur [. . .]. Id. Second, CAE's billing proposal would take effect only if this [. . .]. Id. at 1345; see also Def. Mot. 17 ("Notably, CAE's [. . .]."). Third, compensation for this [. . .] would be capped at [. . .].[11] Id. at 510-19. At best, the Agency stood to save something less than $100,000 in any given year (again, there is no way to estimate).[12] At worst, if [. . .] and [. . .], the Agency stood to save nothing.

Unlike S3 and L3 Doss, the court would not require (or expect) the Agency to make up CAE's entire price premium through its alternative billing method.[13] But the SSA did state that

---

[11] AR 510-23. CAE attempts to minimize the significance of this "plug number" by asserting that "[t]here is nothing remarkable or problematic about [this aspect] of the Solicitation, and many firm-fixed-price Government contracts feature similar CLINs for indefinite, optional work." CAE Mot. 26. However, CAE gives the court no other reason to disregard this limit.

[12] The court also emphasizes that the solicitation requires the Agency to reimburse the contractor "up to" the level of support previously approved. AR 532. In other words, the solicitation provides a ceiling for the reimbursement, but not a floor.

[13] To the extent that it remains relevant, the court also notes that it concurs with the Agency's interpretation of L3 Doss's [. . .] proposal. L3 Doss used the following language to describe its approach:

> [. . .].

AR 1588. In contrast to CAE, whose proposal clearly delineated the circumstances under which

-19-

the Agency expected to glean a "significant cost savings benefit" from this proposal.  Id. at 4865.
The record shows no evidence of such savings; instead, the court sees only a very narrow billing
policy with unpredictable applicability.  The Agency's decision to award this strength lacked a
rational basis.[14]

### 3.   The Agency Did Not Err by Awarding CAE a Strength for Using [. . .]

S3 asserts that because the Agency indicated that FEs rather than flight instructors would
perform NRCM duties on the CH-47 aircraft, the Agency should not have assigned CAE a
strength for proposing to [. . .].  S3 Mot. 26.  The argument is based in large part on questions
submitted by potential offerors, such as the following:

> Are the non-rated crewmembers executing instructional duties of a Flight
> Instructor (FI) or are they performing the Flight Engineers (FE) duties in the
> aircraft?  Paragraph 1.6.11.3.1 and 2 mention FI and FE, 5.4.2 and 4 only shows
> FE.  Also the second note under 5.4.2 states:  "**NOTE:  The NRCM instructors
> will perform Flight Engineer (FE) duties for the CH-47 or Crew Chief (CE) duties
> for the UH-60 as applicable when not instructing students."  There is no
> requirement for CEs in the PWS paragraph 5.4.2.  Also, FEs in CH-47 and CEs in
> UH-60 are not interchangeable duties.  Would the government remove the
> reference to performing CE duties in UH-60?

Id. at 5601.  In response, the Agency stated:  "There is no current requirement (5.4.2) for NRCM
Flight Instructors (FI).  Currently, there is only a need for CH-47 FEs."  Id.  Another offeror
likewise asked:

> PWS Paragraph 5.4.2 Note #2 The NRCM instructors will perform Flight
> Engineer (FE) duties for the CH-47 or Crew Chief (CE) duties for the UH-60 as
> applicable when not instructing students.  Is the intent of the government to use
> CH-47F FI/FE as crew chiefs on the UH-60 Helicopter when they are not
> performing CH-47F non-rated crew duties?

Id. at 5602.  The Agency clarified:  "There is no requirement for Flight Instructors under this
contract; the Government does not intend to use CH-47 FE as stated in the question."  Id.

In response to S3, defendant maintains that the Agency's answers to these questions
indicate only that "offerors did not need to propose [. . .] to meet the minimum terms of the

---

it would [. . .], L3 Doss makes only a vague reference to "proof of actual hours incurred."  The
Agency's conclusion that L3 Doss had not actually proposed a new billing approach was entirely
rational.

[14]   The court saves the question of whether this error prejudiced plaintiffs for its
discussion of the SSA's best value tradeoff.

PWS." Def. Mot. 21. It also asserts that because the solicitation specifically indicated the experience offerors must document to receive credit for proposing [. . .], the offerors were on notice that [. . .]. Id. (citing AR 524). The court concurs with defendant's interpretation. The Agency's answers clearly indicate that the PWS does not require NRCM flight instructors, but as CAE emphasizes, CAE Mot. 27-28, offerors were certainly not prohibited from proposing such staffing. Offerors cannot expect the Agency to exhaustively describe the potential ways they might earn a strength by exceeding the solicitation's requirements. Moreover, the fact that the Agency retained the guidelines for proposing NRCM flight instructors in the final solicitation, which incorporated amendments spurred by the offerors' questions, bolsters defendant's interpretation. To the extent that S3 saw a contradiction between this provision and the Agency's answers, it should have voiced its concerns regarding this ambiguity before the due date for proposals. See Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1313 (Fed. Cir. 2007). Thus, reading the solicitation "as a whole, 'in a manner that harmonizes and gives reasonable meaning to all of its provisions,'" Contract Serv., Inc. v. United States, 104 Fed. Cl. 261, 275 (2012) (quoting Banknote Corp. of Am., 365 F.3d at 1353), the court must conclude that the Agency was permitted to award CAE a strength for this staffing proposal.

### D. Past Performance Factor

L3 Doss's next challenge concerns the Agency's evaluation of the past performance factor. Specifically, L3 Doss alleges that the Agency unreasonably downgraded its incumbent contract reference to a satisfactory confidence rating due to scheduling issues, even though the PPET had concluded that L3 Doss was not entirely at fault and had instituted effective remedial measures. L3 Doss Mot. 23-24. L3 Doss also maintains that because of CAE's 2017 flight accidents, the Agency should not have awarded CAE a substantial confidence rating for the corresponding contract reference.[15] Id. at 25-27. L3 Doss considers this a glaring, prejudicial

---

[15] While L3 Doss states in its motion that CAE received a satisfactory confidence rating for this contract, CAE actually received a substantial confidence rating. AR 5122, 5124. This misunderstanding originally appeared to be based on an error in the narrative summary of the initial past performance evaluation. Id. at 3518. In its response, however, L3 Doss shifts focus to the exact wording of the PPET evaluation for this contact reference: "[T]he Government has a reasonable expectation that the will [sic] offeror will successfully perform the required effort." L3 Doss Resp. 16 (quoting AR 5124). L3 Doss now argues that the phrase "reasonable expectation" corresponds to a satisfactory confidence rating, while a substantial confidence rating would require a "high expectation." Id. (quoting AR 593). However, as CAE emphasizes, the Agency also used this exact wording in reference to L3 Doss's second contract reference, which also earned a substantial confidence rating. AR 5131. And in any event, the Agency itself ultimately showed no confusion regarding the proper rating for this contract reference, stating that CAE's "service and performance [were] truly outstanding, defects were non-existent, [and] all contractual obligations were on-time" and that "the Government would assign this past performance reference a Substantial Confidence rating based upon the quality of the performance reference that was provided above." Id. at 5123-24. The court accepts substantial confidence as the unequivocally intended rating for this contract.

instance of disparate treatment.  Id. at 27.

To establish the disparate treatment of its proposal, a protestor must demonstrate that "the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals."  Office Design Grp. v. United States, 951 F.3d 1366, 1372 (Fed. Cir. 2020).  This standard, newly articulated by the United States Court of Appeals for the Federal Circuit, sets a particularly high bar in the past performance context.  The qualitative assessments involved in evaluating past performance "lie at the heart of the Agency's prerogative, since it is the agency that must bear the burden of any difficulties resulting from a defective evaluation, and we will not substitute our judgment for a reasonably based past performance rating."  DynCorp Int'l LCC v. United States, 139 Fed. Cl. 481, 489-90 (2018).  Thus, "when a Court reviews an evaluation of past performance . . . , 'the greatest deference possible is given to the agency . . . .'"  Walden Sec. v. United States, 136 Fed. Cl. 216, 229 (2018) (quoting Gulf Grp., Inc. v. United States, 61 Fed. Cl. 338, 351 (2004)).

The court first considered this aspect of L3 Doss's past performance evaluation in its decision on S3's initial protest.  Sys. Studies, 146 Fed. Cl. at 200-01.  There, the court determined that the Agency had properly accounted for L3 Doss's staffing issues, id., and the court reaches the same conclusion now.  The SSA weighed the relative effectiveness of both CAE and L3 Doss's strategies for coping with industry staffing challenges, and properly documented her decision.  Compare AR 5129 (noting that after corrective action L3 Doss was still "unable to meet the full requirements of PWS paragraph 5.4.2" and that its remedial measures had been only "somewhat effective"), with id. at 5125 (noting CAE's "[. . .]" and its progress towards resolving pilot shortages).

The court similarly sees no error in the Agency's consideration of CAE's accident history.  "A past performance evaluation is reasonable when the Agency gave 'meaningful consideration' to any possible adverse past performance information documented in the offeror's record."  Fluor Intercontinental, Inc. v. United States, 147 Fed. Cl. 309, 329 (2020), appeal docketed, No. 20-1615 (Fed. Cir. Mar. 26, 2020).  The Agency did exactly that.  On remand, the SSA thoroughly documented her investigation into both the March 2017 and October 2017 incidents, considering the circumstances of the accidents themselves and CAE's effective corrective action.  AR 5566-69.  The SSA determined that CAE's performance for this contract still merited a substantial confidence rating after meaningful consideration, and the court has no basis on which to challenge this conclusion.

On their face, the decidedly distinct issues of staffing shortages and accident response are a poor fit for the Office Design Group "substantively indistinguishable" requirement.  Moreover, the court finds nothing irrational in the Agency's consideration of either issue.  The court therefore will not disturb the Agency's well-reasoned evaluation of the past performance factor.

### E.  Small Business Participation Factor

L3 Doss also maintains that although the Agency assigned its proposal a Good rating under Factor 4, small business participation, the proposal actually qualified for an Outstanding

rating. L3 Doss Mot. 28. Because L3 Doss has consistently exceeded its small business participation goals on past contracts, it argues, the government should have acknowledged its "significant utilization of small business firms in prior contracts." Id. (citing AR 593). This adjustment would have allegedly earned L3 Doss an overall small business participation rating of Outstanding. Id. at 28-29. In response, defendant insists that "L3's small business utilization in past contracts was not an issue identified by the SSEB as driving their overall small business participation rating," and notes that "CAE's proposal was treated similarly." Def. Mot. 28-29. Defendant alternatively argues that even if this criterion should have played a more prominent role in L3 Doss's rating, CAE still offered a superior prior small business utilization rate:

| CAE Reference Contract | Proposed Goal | Achievement | Delta |
|---|---|---|---|
| [. . .] | [. . .] | [. . .] | [. . .] |
| [. . .] | [. . .] | [. . .] | [. . .] |
| [. . .] | [. . .] | [. . .] | [. . .] |

Id. at 29-30 (citing AR 4778). This, the Agency contends, stands in sharp contracts to L3 Doss's rates:

| L3 Reference Contract | Proposed Goal | Achievement | Delta |
|---|---|---|---|
| [. . .] | [. . .] | [. . .] | [. . .] |
| [. . .] | [. . .] | [. . .] | [. . .] |
| [. . .] | [. . .] | [. . .] | [. . .] |

Id. at 30 (citing AR 4794). Defendant thus maintains that if L3 Doss deserved an Outstanding rating, so did CAE. Id.

The Agency offered little explanation in the SSD for downplaying the significance of the offerors' utilization of small business firms in prior contracts. However, even if this constitutes error, L3 Doss has failed to demonstrate that the error was prejudicial. CAE's prior contracts show significantly higher rates of small business utilization than any of L3 Doss's. True, L3 Doss achieved a greater delta between its proposed goals and its achievements on each prior contract, but CAE's much-higher goals left little room for a positive delta to begin with.[16] Although L3 Doss alleges that this high rate is "merely a product of the types of contracts [CAE] has performed in the past," L3 Doss Resp. 22, L3 Doss points to nothing in the solicitation that would require consideration of contract type when evaluating small business utilization. See AR 593 (indicating that the solicitation would consider "[t]he extent of [each offeror's] utilization of small business firms on prior contracts"). L3 Doss has not established that, but for this purported error, "there was a reasonable likelihood that [it] would have been awarded the contract." Data

---

[16] Significantly, CAE only failed to reach or exceed its proposed goal when it aimed to achieve 100% small business utilization. AR 4778.

-23-

Gen. Corp., 78 F.3d at 1562.

## F. Best Value Tradeoff

Finally, both plaintiffs fervently object to the new best value tradeoff made by the SSA. L3 Doss objects to the SSA's statement that "CAE's price is comparable to the other offerors," emphasizing that CAE's total evaluated price of $96,655,774.45 is approximately $[. . .] more than L3 Doss's total evaluated price of $[. . .].  L3 Doss Mot. 32 (quoting AR 4873).  S3 contends that the SSA improperly emphasized CAE's achievements under the staffing factor, while improperly minimizing the value of the other factors.  S3 Mot. 31-36.

The FAR authorizes a best value tradeoff process "when it may be in the best interest of the Government to consider award to other than the lowest priced offeror or other than the highest rated offeror."  FAR 15.101-1(a).  However, selection of a more expensive proposal requires explanation:  The "perceived benefits of the higher priced proposal shall merit the additional cost, and the rationale for [the SSA's] tradeoffs must be documented."  FAR 15.101-1(c).  This tradeoff analysis "obliges the agency to do more than simply parrot back the strengths and weaknesses of the competing proposals—rather, the agency must dig deeper and determine whether the relative strengths and weaknesses of the competing proposals are such that it is worth paying a higher price."  Serco Inc. v. United States, 81 Fed. Cl. 463, 497 (2008).  At the same time, the FAR recognizes that this "documentation need not quantify the tradeoffs that led to the decision."  FAR 15.308.

In the course of her tradeoff analysis, the SSA noted the savings the Agency stood to realize from CAE's [. . .] proposal.  The court has found this strength to be an error, but it must still consider whether the error prejudiced plaintiffs.  Neither plaintiff has demonstrated that, if the Agency had not awarded this strength to CAE, "there was a substantial chance it would have received the contract award."  Galen Med. Assocs., 369 F.3d at 1331 (quoting Statistica, Inc. v. Christopher, 102 F.3d 1577, 1582 (Fed. Cir. 1996)).  Unlike the other strengths awarded to the offerors, CAE's [. . .] strength was based on cost rather than any quality that "exceeds specified performance or capability requirements."  AR 590.  Had the strength significantly impacted her analysis, one would expect to see the SSA incorporate it into her discussion of comparative proposal price.  Such a discussion is conspicuously absent.  See id. at 4870.  This omission is further evidence that the strength was inappropriate to begin with; it is difficult to imagine how the SSA could have incorporated such speculative cost savings into her analysis.  However, it also speaks to the strength's lack of influence on the best value tradeoff.

The SSA did not consider CAE's lead under the staffing factor be a close one, noting: "Despite receiving equal ratings for Factor 2, Outstanding, CAE's proposal is clearly superior to the other offerors' Factor 2 proposals due to numerous strengths in CAE's proposal . . . ."  Id. at 4863.  Eliminating the [. . .] strength, CAE would be left with four strengths under the staffing factor, two of which were not proposed by any other offeror.  Id. at 4864-65.  The next closest offeror for that factor, L3 Doss, would still have only three strengths.  For the technical capability factor, in contrast, CAE and S3 both earned two strengths and an Outstanding rating, while L3 Doss lagged behind with only one strength and a Good rating.  What is more, the SSA

repeatedly emphasized CAE's high number of FTEs.  See id. at 4864 ("CAE proposes manning levels [. . .]% to [. . .]% greater than the number of [FTEs] the Government estimated as necessary . . . for minimal manning requirements."), 4868 (demonstrating that CAE proposed [. . .] more FTEs than L3 Doss, which proposed the next-highest number of FTEs), 4872 (emphasizing that "the Government will realize significant benefits" from, among other advantages, the [. . .] additional FTEs).  This advantage is completely distinct from the question of how an offeror billed [. . .].  In other words, loss of the [. . .] strength would not have disturbed CAE's lead.

As for the remainder of the SSA's best value tradeoff, the court finds no error.  From the beginning of this requirement, the Agency has placed considerable emphasis on staffing and continuity.  For instance, regarding the contract's technical risk, the Agency stated:

> The ability to adequately staff qualified personnel is critical to the accomplishment of the mission.  If the contractor's instructor pilot trainer and management staffing is inadequate, either due to lack of sufficient number of personnel or lack of properly qualified personnel, the quality and validity of the service will be degraded.

Id. at 156; see also id. at 157 (discussing the contract's schedule risk), 4864 (noting that "turn-over of highly trained and experienced personnel is an issue in this program").  This emphasis is reflected in the solicitation.  Thus, it is no surprise that the SSA placed great emphasis on weighing the offerors' strengths under the first two factors—the solicitation required that the technical capability and staffing factors be considered "more importan[t] [than] all other non-price factors."  Id. at 588.  These factors are precisely where CAE distinguished itself.  As the SSA explained:  "Because CAE is the highest rated proposal under Factors 1 and 2, which combined are more important than all other non-price factors the slight differences in proposals under Factors 3 and 4 did not change my decision to award to CAE."  Id. at 4872.

After laying out the relative advantages and disadvantages of each proposal under each factor, the SSA appropriately compared and contrasted the proposals.  She noted CAE's strengths and specifically described the advantages the Agency stood to gain from them.  Id. at 4872-73; see also id. at 4865 (emphasizing that "the only aspect of another offeror's [staffing factor] proposal that CAE's proposal does not contain" was a strength related to [. . .] from [. . .]'s "lower rated" proposal), 4866 (calling CAE's [. . .] section "even more advantageous" than L3 Doss's proposal for the same section).  She did not explicitly quantify how CAE's price premium would be "made up" over the course of performance, nor was she required to.  "[I]n performing the tradeoff analysis, the agency need neither assign an exact dollar value to the worth associated with the technical benefits of a contract nor otherwise quantify the non-cost factors."[17]  Serco, 81 Fed. Cl. at 497.  The SSA documented the strengths offered by CAE, such

---

[17]  L3 Doss seems to suggest that the SSA erred by failing to consider its price side-by-side with that of CAE:  "In violation of FAR 15.308, . . . the SSA did not even consider CAE's price premium over L3 Doss in the Source Selection Decision, but focused instead on a price comparison between CAE and S3, which had a higher total evaluated price than L3 Doss."  L3

as its ability to "overcome the aviation industry challenges of recruiting and retention," AR 4264, in a manner appropriate for such noncost factors, and reasonably concluded that those strengths outweighed the price premium associated with CAE's proposal.

In compliance with FAR 15.04(e)(2), the Agency chose to make the solicitation's nonprice factors "significantly more important" than price. See AR 4871. The SSA stayed true to this obligation, and the solicitation's other guidelines, when she prioritized the first two factors and awarded the contract to CAE. The court finds no error in the SSA's best value tradeoff analysis.

## III. CONCLUSION

Because plaintiffs have not succeeded on the merits of their protest, the court does not find it necessary to address their requests for injunctive relief. See PGBA, LLC v. United States, 389 F.3d 1218, 1228-29 (Fed. Cir. 2004) (emphasizing that a party must demonstrate success on the merits of their case to obtain injunctive relief). Additionally, the court has considered all of the parties' arguments; to the extent not discussed herein, they are unpersuasive, without merit, or unnecessary for resolving the issues currently before the court.

For the reasons discussed above:

1. The court **DENIES** plaintiffs' motions for judgment on the administrative record.

2. The court **GRANTS** defendant's and CAE's cross-motions for judgment on the administrative record.

3. The court has filed this ruling under seal. The parties shall confer to determine agreed-to proposed redactions. Then, by **no later than Monday, November 16, 2020**, the parties shall file a joint status report indicating their agreement with the proposed redactions, **attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated.**

4. Further, the court reminds the parties of their obligation under paragraph 12 of the protective order filed on May 12, 2020, to file redacted versions of protected documents for the public record. If the parties have not already filed redacted versions of their motions and supporting briefs, they shall do so **no later than Monday, November 16, 2020**, or file a joint status explaining the reason for the delay.

---

Doss Mot. 32. But "it simply is not true that the agency was compelled to compare all the offerors to each other—nothing in the FAR, nor any case construing it, remotely suggests this to be the case." Serco, 81 Fed. Cl. at 500. Instead, "the selection of particular pairings is undoubtedly committed to agency discretion." Id.

5. The clerk is directed to enter judgment accordingly and dismiss the case. No costs.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Senior Judge